## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

LA PARILLA, INC., a Minnesota
corporation, and PAUL SELLE,

        Plaintiffs,

v.                                            **MEMORANDUM OF LAW &**

**ORDER**

        Civil File No. 04-4080 (MJD/AJB)

JONES LANG LASALLE AMERICAS, INC.,
THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES, and PPF RTL
ROSEDALE SHOPPING CENTER, LLC., a
Delaware Limited Liability Company

        Defendants.

_____

Erin R. Schulte, Mark V. Steffenson, Henningson & Snoxell, Ltd., Counsel for
Plaintiffs.

Jason R. Asmus, Richard G. Mark, Molly M. Borg, Briggs & Morgan, Counsel for
Defendants.

_____

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment [Docket No. 26].  Defendants seek summary judgment on all of

Plaintiffs' claims and request that the Court grant summary judgment as to their

counterclaims.  The Court heard oral argument on May 25, 2006.

1

II.     **FACTUAL BACKGROUND**

A.      **The Parties**

Plaintiffs are La Parilla, Inc., a Minnesota corporation and its President, Paul

Selle, a Minnesota resident ("Plaintiffs").  Plaintiffs owned and operated "La

Parilla," a quick-service Mexican restaurant located in the Rosedale Center

shopping mall Food Court ("Food Court"), in Roseville, Minnesota.  Defendants

are Jones Lang LaSalle Americas, Inc. ("JLS"), The Equitable Life Assurance

Society of the United States ("Equitable"), and PPF RTL Shopping Center, LLC

("PPF RTL"), ("Defendants").  JLS is a Maryland corporation and the leasing agent

for Equitable and PPF RTL.  Equitable was the owner and landlord of Rosedale

Center at the time the parties executed a lease agreement ("Lease").  PPF RTL is a

Delaware limited liability company that currently owns and operates Rosedale

Center.

B.      **Inception of La Parilla, Inc.**

In the Spring of 2001, JLS leasing agent Holly Rome approached Jose

Pecina, the owner of "Comales y Cazuelas," ("Comales"), a Mexican restaurant in

Minneapolis, about opening a second Comales location in the Rosedale Center

Food Court.  (Steffenson Aff. Ex. A.)  Comales sought assistance with this

endeavor in the fall of 2001 from the Metropolitan Economic Development

Association ("MEDA"), an organization that provides minority companies with

2

business consulting services. (Asmus Aff. Ex. A at 22.)  Selle, a consultant for

MEDA, worked with Comales on revising a business plan for La Parilla, the

proposed new restaurant, to solicit investors and secure financing.  (Id. at 15.)

After Pecina had trouble securing financing and investors, he asked Selle to invest

in the corporation.  (Steffenson Aff. Ex. B at 16.)

### C.    Rome's Revenue Figures

In early 2003, Selle asked Rome to provide him with the actual revenues of

other food court tenants so he could evaluate the business opportunity.  (Id. at

14.)  Although Rome would not provide specific numbers for each restaurant or

vendor, she provided Selle with the high, low and average revenue generation of

all the restaurants or vendors within the food court.  (Id. at 17:15.)  Selle asserts

that Rome informed him that the low end of the average annual revenue

generated in the food court for 2002 was $400,000, while the high end was

$780,000, and the average was $580,000. (Id. at 17-18.)  Based on these averages,

Selle revised the business plan initial annual revenue projections from $420,000 in

2003; $445,200 in 2004; and $471,912 in 2005– to $540,000 in 2003, $600,000 in

2004, $660,000 in 2005 and $720,000 in 2006.  (Asmus Aff. Ex. B at PPF 141;

Steffenson Aff. Ex. J at LAP 412.)

After receiving the figures from Rome, Selle decided to invest in La Parilla

and provided Rome with the revised business plan on or about March 24, 2003.

(Steffenson Aff. Ex. B at 117:11-16.)  He did not attempt to talk to any other food court vendors while preparing these business plans or before commencing operations. (<u>Id.</u> at 124.)

### D.    The Lease

Plaintiffs secured the financing necessary to proceed with the restaurant, and on May 7, 2003, Selle and Comales executed the Lease with Defendants for the purpose of opening and operating La Parilla.  (Asmus Aff. Ex. F.)  In June 2003, Selle and Pecina incorporated La Parilla, Inc.  as a separate entity to operate in the Rosedale Center.  (Asmus Aff. Ex. A at 162-163.)  Selle held 95% interest in both entities.  (<u>Id.</u> at 156.)

Section 20.08 of the Lease contains several provisions relevant to this motion:

> There are no oral or written agreements or representations between Landlord and Tenant regarding the Premises except as expressly set forth herein.  No amendment or modification of this Lease will be binding on Landlord or Tenant unless in writing and signed by each party.  Tenant acknowledges that it has not entered into this Lease in reliance on any representation, warranty or agreement except as expressly set forth in this Lease.  Landlord and Tenant are entering into this Lease in reliance solely upon Tenant's expertise and ability to evaluate the suitability of the Premises and the Center to the conduct of Tenant's business.

(Asmus Aff. Ex. F § 20.08.)

The Lease also provides that:

4

> Section 16.06.   <u>Waiver of Jury Trial.</u>   TO THE EXTENT
> PERMITTED BY LAW, THE PARTIES HERETO EACH
> WAIVE TRIAL BY JURY IN CONNECTION WITH ANY
> DISPUTE ARISING OUT OF OR IN CONNECTION WITH
> THIS LEASE.

(Asmus Aff. Ex. F § 16.06) (caps in original).

### E.   The Stock Redemption and Settlement Agreement

After signing the Lease, Pecina decided that he wanted to keep his interest

in Comales and transfer all his interest in La Parilla to Selle.  In order to effectuate

this split, Plaintiffs and Pecina and Comales entered into a Stock Redemption and

Settlement Agreement ("Settlement Agreement"), dated September 3, 2003.

Under this agreement, Pecina sold his shares in La Parilla back to La Parilla and

Selle sold his shares of Comales back to Comales.  (Asmus Aff. Exh H at § 9.2.)

The Settlement Agreement contains a third party benefit provision:

> 10.5   <u>Third Party Benefit</u>.   Nothing in this Agreement,
> express or implied, is intended to confer on any person
> other than the parties to this Agreement or their respective
> successors or assigns, any rights, remedies, obligations, or
> liabilities, under or by reason of this Agreement.

(Asmus Aff. Ex. H § 10.5)

The Settlement Agreement contains a release by La Parilla and Selle, as the

Remaining Shareholder and Comales as the Selling Shareholder:

> 9.2   <u>Release by La Parilla and Remaining Shareholder</u>.   In
> consideration of the mutual covenants herein contained .
> . . La Parilla and Remaining Shareholder covenant not to
> sue and release and forever discharge Selling Shareholder

> and Comales y Cazuelas, its officers, directors, shareholders, agents, attorneys, accountants, or other representatives, including Equitable, Rosedale Shopping Center, and Jones, Lang, La Salle Americas, Inc., Cherokee State Bank . . . and their successors and assigns, of and from any and all actions or causes of action, suits, debts, claims, complaints, contracts (express or implied), controversies, indemnifications, agreements, promises, damages, judgments, and demands whatsoever, known or unknown, in law or equity, La Parilla and/or Remaining Shareholder ever had, now have, or shall have as of the date of this Agreement.

(Asmus Aff. Ex. H § 9.2.)

The Settlement Agreement was amended on September 30, 2003 and Section 9.2 was amended to include the following language:

> It is expressly understood that this release inures to the benefit of Cherokee State Bank . . . and to the benefit of the Small Business Administration.

(Asmus Aff. Ex. I § 9.2.)

Because both Pecina and Selle had signed the Lease, they also sought consent from Defendants to execute documents to remove Pecina & Comales from the liability under the Lease.  On September 11, 2003, Plaintiffs had executed an Assignment and Assumption of Lease and Novation Agreement with Comales and Defendants, by which Comales assigned its rights and obligations under the Lease to La Parilla, while Equitable agreed to release Comales from liability under the Lease.  (Asmus Aff. Exh. I.)  The signatories to this agreement were Equitable, Comales and La Parilla, and it was attached as an exhibit to the Amended

6

Settlement Agreement.  (Id.)

**F.     The Failure of La Parilla**

La Parilla went into operation in November of 2003.  Immediately, the

business failed to generate the revenues predicted.  At first, Selle speculated that

the problem was one of visibility because the Food Court was still under

construction.  (Steffenson Aff. Ex. B at 250-51.)  However, on January 27, 2004

Selle wrote a letter to Equitable, stating that Rome told him he could expect

revenue generation of $400,000 to $600,000 annually, and that with three

months of business, he was on target to produce $250,000.  (Asmus Aff. Ex. D.)

He addressed his concern that the poor visability problem would not be alleviated

until after Phase II of Food Court construction was completed and requested rent

abatement.  (Id.)

Defendants agreed and on April 7, 2004, the parties executed the First

Amendment to Lease, which granted rent abatement for the period from January

1, 2004, through June 30, 2004.  (Asmus Aff. Ex. K.)  Under this agreement,

Plaintiffs would pay a percentage rent in lieu for a deferral period, calculated at

8% of gross sales, together with utilities and food court expenses.  (Id.)  If this

percentage was paid, rent would be forgiven; if not, all rent would become due

and payable.  (Id.)

Selle investigated and decided that the numbers provided by Rome were

7

incorrect.  After consulting with other food court vendors, he concluded that the

actual revenue numbers were considerably lower than Rome represented.

Plaintiffs allege that the actual numbers were 2002 were as follows: low of

$300,456, average of $400,000, and high of $507,634.  (Steffenson Aff. Ex. H.)

Plaintiffs made no payments to Defendants for the period of January 2004

through November 2004, while remaining in possession of the property.

Defendants pursued an unlawful detainer action and obtained a Writ of Recovery

from the Ramsey County District Court on November 29, 2004, pursuant to which

Plaintiffs were evicted.  (Asmus Aff. Ex. 0.)

### G.    Current Action

Plaintiffs filed this suit against Defendants on September 10, 2004.

Plaintiffs' Amended Complaint asserts three claims against Defendants: Count I:

Fraud in the Inducement, Count II: Violation of the Minnesota Prevention of

Consumer Fraud Act ("MPCFA")  (Minn. Stat. § 325F.68-70), and Count III:

Negligent Misrepresentation.  Plaintiffs seek damages in excess of $50,000 plus

attorneys' fees and costs.

Defendants' Answer denied the allegations of the Amended Complaint and

on January 6, 2005, Defendants filed a Counterclaim against Plaintiffs, asserting

three counterclaims against Plaintiffs: Count I: Breach of Contract, Count II:

Unjust Enrichment, and Count III: Account Stated.

8

Defendants seek summary judgment on all of Plaintiffs' claims and seek summary judgment on their own counterclaims, claiming that they are entitled to a judgment in the amount of $542,078.86 under the terms of the Lease and First Amendment to Lease.

## III.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

The parties agree that Minnesota law applies to this case, and there is a choice of law clause in the Lease stating that, "[t]he laws of the state or commonwealth where the Center is located will govern the validity, performance and enforcement of this Lease."  A court sitting in diversity applies the choice of law requirements of the forum state, and "Minnesota generally recognizes choice of law clauses."  Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d

9

1386, 1392 (8th Cir. 1997) (citation omitted).

**B.    Release Defense**

Defendants argue that they are entitled to summary judgment because the release contained in the Settlement Agreement constitutes a general release of all claims against them.  Although Plaintiffs contend that Defendants waived the affirmative defense of release by failure to plead this defense pursuant to Federal Rule of Civil Procedure 8(c), Defendants counter that failure to plead an affirmative defense does not always constitute a waiver.  Defendants argue that courts may allow unpled affirmative defenses to be asserted when the opposing party has an opportunity to respond and allowance will not prejudice the opposing party.  In the alternative, Defendants request leave to amend their Answer to include this defense pursuant to Fed. R. Civ. P. 15(a).

**1.    Waiver of Release Defense**

Federal Rule of Civil Procedure 8(c) provides in pertinent part that in pleading to a preceding pleading, "a party shall set forth affirmatively . . . release . . . and any other matter constituting an avoidance or affirmative defense." Generally, failure to so plead results in a waiver of that defense.  Although Federal Rule of Civil Procedure 15(c) states that leave to amend the pleadings, "shall be freely given when justice so requires," a pretrial scheduling order has been issued in this case.   Pursuant to Federal Rule of Civil Procedure 16(b): "A schedule shall

10

not be modified except upon a showing of good cause and by leave of the district judge."

On November 8, 2004, Magistrate Judge Lebedoff issued a pretrial scheduling order [Docket No. 7], setting forth a February 1, 2005, deadline to amend the pleadings and raise a new defense. Because the Magistrate Judge issued a Rule 16 pretrial scheduling order, "it may properly require that good cause be shown for leave to file an amended pleading that is substantially out of time under that order." Freeman v. Busch, 349 F.3d 582, 589 (8th Cir. 2003) (citation omitted). The "good cause" standard requires a demonstration that the existing schedule could "not reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16, Advisory Committee Notes – 1983 Amendment.

Because the "function of Rule 15(a) is to enable a party to assert matters . . . that were unknown to him at the time he interposed his original complaint or answer," a party should not be permitted to make an untimely amendment to a complaint to add claims that could have been alleged in the original complaint. Patnaude v. Qwest Corp., No. Civ. 01-1847, 2003 WL 22076564, at *7 (D. Minn. Sept. 2, 2003) (citation omitted).

Under Rule 16, the Court's decision does not turn on the existence of prejudice to the non-moving party. However, the "existence or degree of

11

prejudice to the party opposing the modification and other factors may also affect the decision [to allow amendment]." Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001) (citation omitted). In this summary judgment motion, Defendants raise a new defense after discovery has closed, but provide no information in either this motion or their reply to Plaintiffs' opposition motion as to the cause of the delay in asserting this defense. See Nat'l Liberty Corp. v. Wal-Mart Stores, Inc., 120 F.3d 913, 917 (8th Cir. 1997) (upholding decision to deny motion to amend when the motion was untimely and prejudicial because all depositions had already been taken).

Defendants' request to amend the answer is denied. Defendants have not presented the Court with an explanation as to why this defense was not raised before, or any evidence of good cause, as required by Rule 16. In addition, as discussed below, granting such request would be an exercise in futility because the release defense fails on the merits.

### 2.    Scope of Release

Plaintiffs object that the scope of the release does not include Defendants as third-party beneficiaries. First, Plaintiffs point out that Defendants were not parties to the Settlement Agreement and that the Agreement contains a "Third Party Benefit" clause, which states that there are no third party beneficiaries under the Agreement. Accordingly, Plaintiffs allege that the release was intended

12

to benefit only Comales and La Parilla.

In Cretex Cos., Inc. v. Construction Leaders, Inc., 342 N.W.2d 135, 139 (Minn. 1984), the Minnesota Supreme Court adopted the intended beneficiary approach of the Restatement (Second) of Contracts § 302, which provides that a third party intended beneficiary can enforce a contract if it is appropriate and either the duty owed or the intent to benefit test is met.  The duty-owed test is met if the promisor's performance under the contract discharges a duty otherwise owed the third party by the promisee, while the intent to benefit test is met if the contract expresses some intent by the parties to benefit the third party through contractual performance.  See Twin City Constr. Co. of Fargo v. ITT Indus. Credit Co., 358 N.W.2d 716, 718 (Minn. Ct. App. 1984).  In addition, "[i]n ascertaining the parties' intent to benefit a third party, the contract is read in light of all the surrounding circumstances."  Hickman v. Safeco. Ins. Co., 695 N.W.2d 365, 370 (Minn. 2005).

Defendants have presented no evidence of a duty owed or an intent to benefit.  Neither Comales' nor La Parilla's promise to release the other from all claims discharged a duty owed to Defendants.  As to intent, the language of the Agreement states that no third party beneficiaries are created.  Although Defendants are listed in the release language, they are listed only in their capacity as agents or representatives of the parties and in fact never acted in that capacity

13

towards the parties.  Lack of intent is also shown through the language of the

Amended Stock Redemption and Settlement Agreement, which added an express

release of Cherokee State Bank.  Because Cherokee State Bank was listed with the

Defendants in the "first" release, the added release language would have been

unnecessary if the parties intended that language to benefit all the parties listed.

The Court finds that the language of the release intended to refer to Defendants

as representatives of the parties themselves, not as intended beneficiaries.

The Court finds that Defendants' motion to amend is untimely, without

good cause, and futile and therefore, the motion to amend is denied.

### C.    The Minnesota Prevention of Consumer Fraud Act

Plaintiffs claim that they are consumers for the purposes of the MPCFA and

that successful prosecution of their claim would confer a public benefit, as

required by the Minnesota Private Attorney General statute.  Defendants assert

that summary judgment should be granted as to Count II of the Complaint

because Plaintiffs are not "consumers" under the MPCFA, and because the Act, as

enforced through the Minnesota Private Attorney General Statute, requires that

Plaintiffs' claim must benefit the public.

The Minnesota Prevention of Consumer Fraud Statute provides:

> The act, use, or employment by any person of any fraud,
> false pretense, false promise, misrepresentation, misleading
> statement or deceptive practice, with the intent that others
> rely thereon in connection with the sale of any

14

merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in Section 325F.70.

Minn. Stat. § 325F.69, subd. 1.

### 1.    Selle's Status as a Consumer or Merchant

The MPCFA prohibits the intentional use of a deceptive practice in connection with the sale of merchandise to a consumer.  See Ly v. Nystrom, 612 N.W.2d 302, 310 (Minn. 2000).  In determining the applicability of the MPCFA, the Minnesota Supreme Court has distinguished between a consumer entitled to protection under the Act, and a merchant, as defined by the Uniform Commercial Code, not entitled to its protection.  Church of the Nativity of our Lord v. Watpro, 491 N.W.2d 1, 7-8 (Minn. 1992), overruled on other grounds by Ly v. Nystrom, 612 N.W.2d 302 (Minn. 2000).  The U.C.C., as enacted in Minnesota, defines the term merchant in relevant part as "a person who deals in goods of the kind or otherwise by his occupation holds out as having knowledge or skill peculiar to the practices or goods involved in the transaction."  Minn. Stat. § 336.2-104(1).  The MPCFA does not define the term "consumer."  However, the Minnesota Supreme Court has determined that the legislative history "clearly indicates that the CFA was intended to protect a broad, though not limitless, range of individuals."  Ly, 615 N.W.2d at 310.

Defendants argue that Plaintiff Selle is a merchant, rather than a consumer.

15

Plaintiffs are sophisticated and knowledgeable, Defendants claim, and entered

into arm's length commercial lease negotiations with Defendants.  Defendants

point out that Plaintiff Selle established a business plan, secured financing, leased

equipment, entered into Lease negotiations and ran a restaurant business.  Thus,

Defendants conclude that Plaintiffs are merchants outside the scope of the

MPCFA's protection.

        Minnesota courts have broadly construed the term "consumer" to include

corporations and businessmen like Selle.  In <u>Ly</u>, the Minnesota Supreme Court

found that the MPCFA did apply to a restaurant owner who alleged that the seller

committed fraud by providing false monthly revenue figures.  <u>Id.</u>  The court

determined that the plaintiff purchased the restaurant for the purpose of

operating restaurant services, as opposed to reselling the business: "His status was

therefore more of a consumer of the restaurant business than a buyer of a business

for resale."  <u>Id.</u>  Thus, the <u>Ly</u> court concluded that the plaintiff was a consumer

rather than a merchant.

        The Court finds that Plaintiffs are consumers for the purposes of the

MPCFA.  Under the Act, the definition of consumer is quite broad and Plaintiffs

entered into the Lease for the purpose of operating a restaurant, and not to

release or resell the business.

## 2.   The Minnesota Private Attorney General Statute

The MPCFA operates in conjunction with and is enforced through the Minnesota Private Attorney General Statute, allowing an injured party to recover damages plus attorneys' fees and costs.  Minn. Stat. § 8.31, subd. 3(a).  The statute applies only to claimants who demonstrate that their cause of action benefits the public.  Ly, 615 N.W.2d at 314.

Plaintiffs assert that the public benefit at stake is the prevention of  repeated fraudulent activities by Defendants towards those individuals and companies seeking to lease space within entities owned and operated by Defendants. Plaintiffs point out that Rosedale Center has 149 tenants and that Defendants own malls throughout Minnesota.  Plaintiffs contend that allowing this claim advances the interests of small businesses and would deter Defendants from misrepresentations.

In Ly, the court determined that based on the language of the Act, and the sweeping remedies permitted under the Private Attorney General Statute, "the legislature could not have intended to sweep every private dispute based on fraud, and falling within the CFA, into a statute where attorneys' fees and additional costs and expenses would be awarded . . . ."  Ly, 615 N.W.2d at 314. Accordingly the court determined that claims under the Act must confer a public benefit.  Id.

The <u>Ly</u> court found that the sale of the business to the plaintiff was a one-on-one business transaction that therefore did not confer a public benefit that would entitle him to proceed under the Private Attorney General Statute.  <u>Id.</u>  <u>See also</u> <u>Behrens v. United Vaccines, Inc.</u>, 228 F. Supp. 2d 965, 971 (D. Minn. 2002) (rejecting deterrence argument in a case involving false representations, finding no public benefit, "other than a theoretical one."); <u>Jensen v. Duluth Area YMCA</u>, 688 N.W.2d 574, 578 (Minn. Ct. App. 2004) (holding that successful prosecution of a single one-on-one incident would not advance state interest or benefit the public).

This case involves an ordinary commercial lease transaction.  The Court finds that this transaction presents a single, one-on-one business transaction, and that no representations were made by Defendants to the public at large.  As in <u>Behrens</u>, Plaintiffs seek redress of personal, business damages.  <u>Behrens</u>, 228 F. Supp. 2d at 972.  Accordingly, successful prosecution of Plaintiffs' claim would not confer a public benefit as required by the Private Attorney General statute.  Thus, summary judgment is granted as Plaintiffs' claim that Defendants violated the MPCFA.

**D.     Fraud Claim**

Defendants argue that summary judgment should be granted as to Count I, Plaintiffs' fraudulent inducement claim, because Plaintiffs cannot prove the

required element of reasonable reliance because they contractually agreed that they did not rely on any representations made by Defendants.  (Asmus Aff. Ex. F § 20.08.)  Thus, Defendants urge that reliance upon an oral representation expressly contradicted by a written agreement is unreasonable as a matter of law. Defendants also protest Plaintiffs' offer of parol evidence, arguing that it is inadmissible where the contract clearly states the parties' intent.

Plaintiffs allege that Defendants fraudulently induced them to sign the Lease by making misrepresentations about the actual annual revenue generation of the food court tenants.  Plaintiffs claim that they reasonably relied on these misrepresentations in deciding to enter into the Lease agreement.  Plaintiffs note that parol evidence is allowed in cases of fraudulent inducement, because proven fraud will void a contract.

> The required elements of a fraud action are:
>
> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.

Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986).

Under Minnesota's parol evidence rule, "when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict,

or alter the written agreement." Hruska v. Chandler Assocs., Inc., 372 N.W.2d

709, 713 (Minn. 1985) (citation omitted). An exception to that rule is when an

agreement is challenged on grounds of fraud. Johnson Bldg. Co. v. River Bluff

Dev. Co., 374 N.W.2d 187, 193 (Minn. Ct. App. 1985). Evidence of fraudulent

representations are admitted to show that the contract is void. Id.

This exception does not apply where a contract provision "explicitly states a

fact completely antithetical to the claimed misrepresentations." Commercial Prop.

Invs., Inc. v. Quality Inns Int'l, Inc., 938 F.2d 870, 875 (8th Cir. 1991) (citations

omitted). Accordingly, general disclaimers and standard integration clauses have

been deemed "ineffective to negate reliance." Clements Auto Co. v. The Service

Bureau Corp., 444 F.2d 169, 178-79 (8th Cir. 1971).

As to the question of reliance, under Minnesota law,

> Where there is an inconsistency between oral promises and the
> written terms of an agreement, the issue is whether there could be
> reasonable reliance on the promise. We could find that reliance on
> an oral representation was unjustifiable as a matter of law only if the
> written contract provision explicitly stated a fact completely
> contradictory to the claimed misrepresentation. When a promise is
> not in plain contradiction of a contract or, if contradictory, when it is
> accompanied by misrepresentations of other material facts in addition
> to the contradictory intent, the question of reasonable reliance is for
> the trier of fact.

Johnson Bldg. Co., 374 N.W.2d at 194 (citations omitted). See also Jorde v.

Reachout, Inc., No. C1-90-1465, 1991 WL 1947, at *2 (Minn. Ct. App. Jan. 15,

1991) (unpublished) (holding that a contracting party's fraudulent inducement

20

defense fails as a matter of law when the alleged misrepresentations are "explicitly contradicted" in the written contract).

Summary judgment is denied as to Plaintiffs' fraud claim because a fact issue remains as to reasonable reliance. The representations alleged by Plaintiffs concerning actual sales revenues of the Food Court tenants are not directly contradicted by the boilerplate language of the Lease. The Lease states in relevant part: "Tenant acknowledges that it has not entered into this Lease in reliance on any representation, warranty or agreement except as expressly set forth in this Lease." (Asmus Aff. Ex. F § 20.08.) This is standard language in a commercial lease agreement and is too broad to operate as a bar to Plaintiffs' claim of reasonable reliance. Had Plaintiffs signed a Lease that specified that they did not rely on any representations concerning any financial data provided by Defendants, the Court might be faced with a representation in direct contradiction with what the parties agreed to at the time they signed the Lease. However, here the general language of the disclaimer is not in direct contradiction with Defendants' alleged representations. As to Defendants' argument that parol evidence is inadmissible where the parties have executed a written agreement, the Court notes that the parol evidence rule is inapplicable to exclude evidence of fraudulent oral representations by one party which induce another to enter into a written contract. Accordingly, the Court finds that an

issue of fact remains as to the question of reasonable reliance.

### E.    Negligent Misrepresentation Claim

Defendants argue that Plaintiffs' negligent misrepresentation claim fails because they owed no duty of care to Plaintiffs and because the parties were sophisticated equals engaged in an arm's length negotiation.  Furthermore, Defendants point out that the Lease explicitly states that Defendants owe no duty of care to Plaintiffs and that Plaintiffs may not rely on any representations made by Defendants.

Plaintiffs claim that a duty of care was created because Defendants provided information to guide them in the Lease transaction.

Minnesota has adopted the Restatement (Second) of Torts definition of negligent misrepresentation, which provides:

> One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552.  See also Bonhiver v. Graff, 248 N.W.2d 291, 298 (Minn. 1976) (citation omitted).

Whether a duty of care exists is a question of law.  Safeco Ins. Co of Am. v. Dain Bosworth, Inc., 531 N.W.2d 867, 873 (Minn. Ct. App. 1995).  Under

Minnesota law, no duty of care exists between sophisticated equals negotiating a business transaction unless the parties have a special relationship.  Smith v. Woodwind Homes, Inc., 605 N.W.2d 418, 424-25 (Minn. Ct. App. 2000).  See also Safeco, 531 N.W.2d at 871-72.  Without evidence of a special relationship, no duty of care exists.

In Safeco, the court determined that, "Because Dain was selling a deal to Safeco, and not supplying information for the guidance of Safeco, and because they were sophisticated equals negotiating a commercial transaction, Dain did not owe Safeco a duty for purposes of a negligent misrepresentation tort threshold."  Id. at 872.  The court reasoned that, "It would be unreasonable to impose a duty whenever a party gives *any* information to another party."  Id. at 873.  The court distinguished commercial relationships from those where the parties have a special relationship, such as attorney-client, insurance agent-client, and real estate agent-client.  "In other commercial relationships, for example between parties to a contract, the aggrieved party is limited to suit in contract or fraud."  Id.

There was no special relationship between Plaintiffs and Defendants, and thus Defendants did not owe Plaintiffs a duty of care.  Although Defendants provided information to Plaintiffs, they were not guiding them.  The parties negotiated and entered into an ordinary commercial lease.  Moreover, Selle is a sophisticated businessman who was represented by counsel during the lease

negotiations.  Accordingly, summary judgment is granted as to this claim.

    **F.**    **Waiver of Right to a Jury Trial**

Defendants argue that the Court must strike Plaintiffs' request for a jury trial from the Complaint because Plaintiffs waived the right to a jury trial under the terms of the Lease.  (Asmus Aff. Ex. F § 12.06.)  A jury trial may be legally waived, Defendants assert, noting that Plaintiffs were represented by counsel in the Lease negotiations and execution.

Plaintiffs counter that Selle did not sign the Lease in his personal capacity and thus he retains the right to a jury trial in that capacity.  In addition, Plaintiffs claim that because Defendants fraudulently induced them to enter into the Lease, the waiver does not apply.

The right to a jury trial in the federal courts is governed by federal law. Telum, Inc. v. E.F. Hutton Credit Corp., 859 F.2d 835, 837 (10th Cir. 1998).  The constitutional right to a jury trial may be waived by parties' agreement.  U.S. Const. Amend. 7; M.S.A. Const. Art. I, § 4.  In Northwest Airlines, Inc. v. Air Line Pilots Ass'n, the Eighth Circuit concluded that it is "well settled that a right to a jury trial may be waived."  373 F.2d 136, 142 (8th Cir. 1967) (determining that acceptance of a contract provision providing for dispute resolution in a forum where there is no entitlement to a jury trial is implied waiver of jury trial and satisfies the voluntary and knowing standard).

Pre-litigation jury trial waivers have not been addressed by the Eighth Circuit.  However, in <u>Coop. Fin. Ass'n, Inc. v. Garst</u>, 871 F. Supp. 1168, 1171 (N.D. Iowa 1995), the court determined that "[c]ontractual waivers of the right to a jury trial are neither illegal nor contrary to public policy." (citing <u>Telum</u>, 859 F.2d at 837).  In <u>Telum</u>, the Tenth Circuit Court of Appeals rejected an argument that allegations of fraud in the inducement relating to the contract as a whole were sufficient to vitiate the provision.  <u>Id.</u>  Finding that the U.S. Supreme Court has held that fraud in the inducement claims were insufficient to affect an arbitration clause, the court reasoned that a jury trial waiver should be similarly dealt with, especially because "arbitration involves a greater compromise of procedural protections than does the waiver of the right to trial by jury."  <u>Id.</u> at 838 (citing <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 403-04 (1967)).

A waiver is effective if the party waiving the right does so knowingly and voluntarily.  <u>Brookhart v. Janis</u>,  384 U.S. 1, 4-5 (1966).  Because the right to a jury trial is a fundamental right, there is a presumption against waiver.  <u>Aetna Ins. Co. v. Kennedy ex rel. Bogash</u>, 301 U.S. 389, 393 (1937).

The circuits are split as to which party bears the burden of showing that a contractual waiver was knowing and voluntary.  <u>See</u> <u>Coop. Fin. Ass'n, Inc. v. Garst</u>, 871 F. Supp. at 1172.  However, the Court concludes that the presumption should be borne by the party asserting the waiver, as this is the party who seeks its

25

benefit.  See id. at n. 2.

Courts consider numerous factors to determine whether a waiver was knowing and voluntary, including "whether the waiver provision is on a standardized form agreement or newly-drafted document, in fine print or in large or bold print, set off in a paragraph of its own, in a take-it-or-leave-it or negotiated contract, and the length of the contract," as well as whether the waiving party was represented by counsel, whether the waiving party was a sophisticated business person, whether the parties were manifestly unequal in bargaining power, and whether the waiving party had an opportunity to review the contract terms.  Id.

The Court concludes that jury waiver provision contained in the Lease is enforceable.  The terms of the waiver are clear, the provision is set apart in a paragraph of its own and appears in all capital letters, unlike the surrounding provisions.  Selle is an experienced businessman, represented by counsel during the Lease negotiations and execution.  There is no evidence of manifest inequality of bargaining power.  Thus, the jury waiver provision is upheld as a knowing and voluntary waiver by Plaintiffs.  As to Plaintiffs' argument that Selle did not waive his right to a jury in his individual capacity, that argument fails, as Selle brought this action in his official capacity as President of La Parilla.

### G.    Counterclaims

Because the motion for summary judgment is denied as to Plaintiffs' claim

of fraud, the Court does not grant summary judgment as to Defendants'

counterclaims.  If Plaintiffs persuade the trier of fact that the Lease was procured

fraudulently by Defendants, the Lease would be void and unenforceable.  Thus,

the Court denies Defendants' motion for summary judgment as for counterclaims

of breach of contract, unjust enrichment, and account stated.

### H.    Conclusion

The Court grants Defendants' motion for summary judgment as to the

claims of violation of the MPCFA.  Plaintiffs' claims do not confer a public benefit

as required by the Minnesota Private Attorney General statute.  This was a one-

on-one commercial business transaction, and there is no evidence that the

representations made by Defendant were made to the public at large.  As to the

negligent misrepresentation claim, summary judgment is granted.  Defendants did

not owe a duty of care to Plaintiffs because the parties had no special relationship.

Summary judgment is denied as to Plaintiffs' fraud claim because there is an issue

of material fact as to whether Plaintiffs reasonably relied on Defendants'

representations.  Accordingly, Defendants' request for summary judgment on the

counterclaims is denied.

**IT IS HEREBY ORDERED** that

A.  Defendants Jones Lang LaSalle Americas, Inc.'s Motion for
    Summary Judgment [Docket No. 26] is **DENIED** in part and
    **GRANTED** in part as follows:

    A.  Count II: Violation of the Minnesota Prevention of
        Consumer Fraud Act; and Count III: Negligent
        Misrepresentation are **DISMISSED**.

    B.  Count I: Fraud in the Inducement remains.

    C.  Summary judgment as to Counterclaims, Count I: Breach
        of Contract, Count II: Unjust Enrichment, and Count III:
        Account Stated, are denied.

Dated:   July 26, 2006                    s / Michael J. Davis
                                          Judge Michael J. Davis
                                          United States District Court